# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8661 | **DATE** | 9/29/2003 |
| **CASE TITLE** | Michael Bliss vs. Jennifer Convertibles, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 10/21/2003 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. 21-1) is hereby granted as to Counts I and III, denied as to the disparate treatment claim of Count II, and granted as to the reasonable accommodation claim of Count II.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 3 0 2003 date docketed | **15** **46** |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 9/29/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| ETV | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 03 SEP 29 PM 4: 15 Date/time received in central Clerk's Office | ETV mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL BLISS,                )
                             )
          Plaintiff          )
                             )
     v.                      )     No. 01 C 8661
                             )
JENNIFER CONVERTIBLES, INC.  )     Judge Rebecca R. Pallmeyer
                             )
          Defendant.         )

DOCKETED

SEP 3 0 2003

## MEMORANDUM OPINION AND ORDER

Until mid-November 1999, Michael Bliss ("Bliss") was a sales associate with Jennifer Convertibles, Inc. at its highest-volume store in the Chicago region. Bliss, who is HIV positive, took a few days off from work due to a bout of depression, and Jennifer Convertibles immediately replaced him. Plaintiff alleges that Defendant terminated him in violation of the Family & Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), Title I, 42 U.S.C. §§ 12111 *et seq.*, and Illinois common law of contract. Defendant now moves for summary judgment. For the reasons stated below, Defendant's motion for summary judgment is granted in part and denied in part.

## FACTUAL BACKGROUND

Jennifer Convertibles, Inc. ("Jennifer Convertibles") is a nationwide furniture store that specializes in selling sofas, sofa beds, and other living room furniture and home accessories. (Defendant's Statement of Material Facts (hereinafter, "Def.'s 56.1") ¶ 3.) As of November 1999, Defendant had a total of 14 stores in the Chicago metropolitan area within a 75-mile radius of the North Avenue store. (Def.'s 56.1 ¶ 39; Plaintiff's Response to Defendant's Statement of Material Facts (hereinafter, "Pl.'s Resp. 56.1") ¶ 39.) On October 8, 1997, Defendant hired Bliss to work as a sales associate at Defendant's store located at 730 W. Diversey Parkway, Chicago, Illinois (the "Diversey store"), (*id.* ¶ 5; Pl.'s Resp. 56.1 ¶ 5; Ex. A to Veltri Declaration (hereinafter "Veltri



Decl.").) In mid-1998, Wayne Caplan ("Caplan"), Defendant's Midwest Regional Manager until his voluntary resignation on November 12, 1999, offered Plaintiff a management position at the Addison store where Caplan worked. Plaintiff did not accept that position because the Diversey store where he was working had stronger sales. (Def.'s 56.1 ¶ 11; Pl.'s Resp. 56.1 ¶ 11; Bliss Deposition (hereinafter "Bliss Dep."), Ex. B to Plaintiff's Appendix of Exhibits in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Pl.'s App."), at 60.) In July 1999, at Plaintiff's request, Defendant transferred Plaintiff to the North Avenue store, where he worked until the termination of his employment with Defendant in November 1999. (Def.'s 56.1 ¶ 6; Pl.'s Resp. 56.1 ¶ 6.)

When Plaintiff began working for Defendant, he was given a copy of the Jennifer Convertibles Sales Associate Handbook (the "Handbook"). Plaintiff reviewed the Handbook during his initial training and probationary period. On October 8, 1997, he signed a form titled "Acknowledgment of Receipt of the Personnel Handbook for Sales Employees of Jennifer Convertibles and Jennifer Leather." On January 14, 1999, he signed an updated "Acknowledgment." (Def.'s 56.1 ¶¶ 43-47; Pl.'s Resp. 56.1 ¶¶ 43-47.) The Acknowledgment Plaintiff signed on October 8, 1997 included the following language:

> I also understand that nothing contained in the Handbook will be construed to modify, change, or vary the at-will nature of my employment relationship with Jennifer. The Handbook and any other employment policies communicated to me by Jennifer are not intended to create an employment contract, and I understand that no promises to the contrary are binding on Jennifer unless they are made in writing and signed by Jennifer's Senior Vice President of Retail Stores.

(Ex. 3 to Bliss Dep.) The Acknowledgment he signed on January 14, 1999 contained similar language:

> I have entered into my employment relationship with Jennifer voluntarily and acknowledge that there is no specified length of employment. Accordingly, either Jennifer or I can terminate the relationship at will, with or without cause, at any time, so long as there is no violation of applicable federal or state law . . . . Furthermore, I acknowledge that this handbook is neither a contract of employment nor a legal document.

2

(Ex. 4 to Bliss Dep.) Plaintiff claims that the Handbook constitutes a written contract under state and federal law in light of Defendant's "custom and practice ('day-to-day thing') of providing FMLA and other benefits to their employees regardless of eligibility." (Pl.'s Resp. 56.1 ¶ 48.) Defendant disputes this claim and notes, correctly, that this is a question of law, not of fact. (Def.'s 56.1 ¶ 48; Defendant's Reply to Plaintiff's Response to Defendant's Statement of Material Facts (hereinafter "Def.'s Reply 56.1") ¶ 48.) Plaintiff also claims that the sections of the Handbook relating to family and medical leave mirror provisions of the FMLA; Defendant disputes this contention, pointing out that Plaintiff merely cites the entire Handbook to support his contention. (Pl.'s 56.1 ¶ 32; Defendant's Response to Plaintiff's Statement of Material Fact & Supplemental Statement of Material Facts (hereinafter "Def.'s Resp. 56.1") ¶ 32.)[1]

Plaintiff claims there was a notice regarding FMLA rights posted in the bathroom of the North Avenue store. (Pl.'s 56.1 ¶ 35.) Defendant asserts that the document posted in the bathroom related to "employees' rights for disability." (Def.'s 56.1 ¶ 35.) Both parties cite the deposition of Patricia Potempa ("Potempa"), a general manager who oversaw the North Avenue store and additional stores in the area and was Plaintiff's direct supervisor. Potempa testified that she never saw FMLA leave request forms in the store, although "they had like a document in the bathroom of the store" that "had to do with disability or something." (Def.'s 56.1 ¶ 10; Pl.'s Resp. 56.1 ¶ 10; Potempa Deposition, (hereinafter, "Potempa Dep."), Ex. D to Pl.'s App., at 39.) She explained that a bulletin board in the bathroom "had a whole bunch of writing on it," including "like the employees' rights for disability." (*Id.* at 40-41.) Neither party has offered a copy of the poster or of any items posted on the bathroom bulletin board.

Defendant maintained a policy whereby it granted employees "leaves of absence (whether

---

[1]      Plaintiff actually cites only the one-page Employee Acknowledgment Form to the Handbook, which makes no mention of family or medical leave, but the court presumes Plaintiff intended to cite the Handbook itself. (Pl.'s 56.1 ¶ 32, citing Ex. 4 to Bliss Dep.)

it was family, medical or personal) regardless of the employees' eligibility under the FMLA because the company did not distinguish between personal leave and leave pursuant to the FMLA." (Def.'s Resp. 56.1 ¶ 37.) Defendant denies that "such leave was granted pursuant to the FMLA," (Def.'s Resp. 56.1 ¶ 37), but its own witnesses referred to "FMLA leave" on several occasions. For example, in her deposition, Kimberly Good, Jennifer Convertible's New-York based National Sales Director, was asked, "Was it Jennifer Convertibles' policy to give *FMLA leave* to those individuals who worked for them who were medically qualified to take that leave?" Ms. Good responded affirmatively. (Good Deposition (hereinafter "Good Dep."), Ex. F to Pl.'s App., at 32 (emphasis added).) Likewise, she testified that several employees, including Good herself, took "FMLA leave" for maternity leave and for various physical injuries. (*Id.*, at 25-27, 29-30.)

Since the FMLA was enacted in 1993, Defendant granted "dozens" of employees leave for a variety of medical conditions, (Pl.'s 56.1 ¶ 38; Def.'s Resp. 56.1 ¶ 38), and, in fact, has not denied an employee's request for personal or sick leave in the past ten years. (Pl.'s 56.1 ¶ 41; Def.'s Resp. 56.1 ¶ 41.) For example, Defendant granted Dale Veltri, Assistant Comptroller for Jennifer Convertibles, maternity leave for 12 weeks from approximately September 1999 to December 1999. (Pl.'s 56.1 ¶ 40; Def.'s Resp. 56.1 ¶ 40); Veltri Deposition (hereinafter "Veltri Dep."), Ex. J to Pl.'s App., at 8-9, 49.)

During the period August 26-30, 1998, Plaintiff himself used personal leave days for minor surgery. (Def.'s 56.1 ¶ 18; Pl.'s Resp. 56.1 ¶ 18.)

**Events Prior to November 9, 1999**

Defendant typically assigns two employees to each store–a sales associate and either a sales manager or a general manager. (*Id.* ¶ 15; Plaintiff's Response to Defendant's Statement of Material Facts, (hereinafter, "Pl.'s Resp. 56.1") ¶ 15.) On weekends, both employees work both days. (*Id.*) During the week, each salesperson typically works one eleven-hour day, e.g., 10:00

4

a.m. to 9:00 p.m. (referred to as an "iron day"), takes one day off, and works the remaining three days either between 10:00 a.m. and 5:00 p.m. or between 2:00 p.m. and 9:00 p.m. (*Id.* at 20-21.)

On a date not specified in the record, Caplan told Plaintiff that, if he had to leave the store during his shift, he had to communicate with another employee to ensure the shift was covered, "even if he had to leave a message." (Pl.'s Resp. 56.1 ¶ 15; Def.'s Reply 56.1 ¶ 15; Bliss Dep., at 187, 201; Def.'s Resp. Interrog. ¶ 20; Caplan Deposition (hereinafter "Caplan Dep."), Ex. E to Pl.'s App., at 65-66.) Caplan testified that despite directions to Bliss not to close the store without a replacement, Bliss in fact "repeatedly just closed the store and left an automated voice mail." (Caplan Dep., at 65-66.) On October 26, 1999, Bliss left Caplan a voice mail message in which he stated that he was closing the North Avenue store during business hours because he had a migraine headache, but he did not find a replacement before closing the store. (Def.'s 56.1 ¶ 16; Def.'s Resp. Interrog. ¶ 20; Bliss Dep., at 177-81, 207-209; Potempa Dep., at 64-68, 74-76; Caplan Dep., at 59-60, 67.) In a handwritten statement dated October 26, Potempa wrote that Plaintiff closed the showroom at approximately 5:00 p.m., that the store was supposed to stay open until 9:00 p.m., that Plaintiff had said he needed to leave because he was experiencing migraine headaches, and that this incident "marked the second or third time he had closed the store early without contacting anyone to cover the hours." (Caplan Dep., at 67-69; Ex. 9 to Caplan Dep.) Plaintiff does not dispute that he closed the store early without contacting anyone on two or three occasions prior to October 26.

Defendant contends that, prior to October 26, 1999, Caplan informed Plaintiff of the importance of finding a replacement if he needed to leave work due to illness. (Def.'s 56.1 ¶ 17; Bliss Dep., at 187, 201; Caplan Dep., at 65-66.) Plaintiff maintains that Caplan did not discuss the importance of leaving a message for someone regarding store coverage until after Plaintiff went home sick on October 26. (Pl.'s Resp. 56.1 ¶ 17; Bliss Dep., at 187, 201.) In their depositions, however, neither Plaintiff nor Caplan were specific about whether Caplan's admonishment occurred

5

before or after October 26. Defendant also states that Potempa had explained to Plaintiff the proper procedure for taking sick leave. (Def.'s 56.1 ¶ 17.) In her deposition, however, Potempa stated only that she "might have" told Plaintiff the proper procedure for leaving work due to illness "after the first or second time that he called in after closing the store." (Potempa Dep., at 66.) She stated that she could not remember the date when she discussed sick leave procedures with Plaintiff, but that she believed she had written it down. (Id. at 67.) She told Plaintiff that, instead of calling Caplan or leaving a voice mail message for someone else, it was important to find someone to cover his shift, or to speak to Caplan or another manager directly. (Id.) She considered this conversation to be a "discussion about how to handle it next time," rather than a warning or anything "threatening." (Id. at 67-68.)

The parties dispute the number of Jennifer Convertibles employees in this region during the November 8, 1999 to November 21, 1999 pay period: Defendant contends there were 31, while Plaintiff claims there were 50. (Def.'s 56.1 ¶¶ 40, 42; Pl.'s Resp. 56.1 ¶¶ 40, 42.) Defendant points to Defendant's payroll records for the pay period ending November 21, 1999, Veltri's declaration, and Good's deposition. (Ex. A to Veltri Decl.; Veltri Decl. ¶¶ 1-5, 7; Good Dep., at 73-85.) The payroll records provide information for 50 employees, 30 of whom showed an employment status of "active," 19 of whom were listed as "terminated," including Plaintiff, and one who was on a leave of absence. (Ex. A to Veltri Decl.) The records further show that two employees–Caplan and Plaintiff–had a termination date of November 12, 1999, and that the remaining 17 terminated employees had termination dates preceding the November 8 start of the pay period–as early as January 11, 1999. (Id.) In her declaration, Veltri stated that the records are administered by Automatic Data Processing ("ADP"), include all stores within a 75-mile radius of the Jennifer Convertibles store located at 814-816 W. North Avenue, Chicago, Illinois (the "North Avenue store"), that the records were produced at or near November 26, 1999, the pay date, and that they

6

were kept in the course of a regularly-conducted business activity. (Veltri Decl. ¶ 3.)[2] She also

stated that the records show the dates of hire and of termination or leave of absence, if applicable,

and that the word "'terminated' signifies the employee's separation from an employment

relationship with Jennifer Convertibles, regardless of the circumstances." (Id. ¶¶ 4-5.) In her

deposition, similarly, Veltri testified that "termination" means the employee either quit or was fired.

(Veltri Dep., at 17.) Defendant acknowledges that, during this pay period, Defendant paid four

former employees some combination of their draw (or advanced commission), commission, and

"spiff" payments—bonuses on products a terminated employee sold prior to his or her termination

that are delivered within 30 days of the termination date. (Def.'s 56.1 ¶ 41; Pl.'s Resp. 56.1 ¶ 41.)

In her deposition, Good testified that, according to the payroll records, there were 30 active

employees and one employee on leave of absence during the relevant period. (Good Dep., at 82.)

She also testified that it can take up to 60 days after an employee's last day of work for Defendant

to make "spiff" payments to the employee. (Good Dep., at 83.) She also indicated that, based on

a letter she received from Defendant's assistant comptroller, this ADP payroll journal included all

employees who were employed by Defendant in 1999, regardless of their status during the pay

period. (Id. at 84-85.) Plaintiff simply asserts that, because there are 50 employees on the payroll

record in question, the court must conclude that Defendant employed 50 individuals in the Chicago

region, rather than 31. (Pl.'s Resp. 56.1 ¶ 40.)

Plaintiff also makes several observations about the payroll records and Veltri's declaration

that are apparently calculated to create a dispute of material fact as to the number of active

employees working for Defendant within 75 miles of the North Avenue store at the time. (Pl.'s 56.1

---

[2]    Plaintiff objected to Defendant's use of Dale Veltri's Declaration since Defendant had
not disclosed her as a witness in its Rule 26(a) disclosure and Plaintiff was not aware that she
might be called as a witness. (Pl.'s Resp. ¶ 40.) The court denied Plaintiff's Motion to Strike the
Declaration of Dale Vetri [31-1] on January 22, 2003 and permitted Plaintiff to depose her. (See
Minute Order, 32-1.) This evidence is admissible.

¶¶ 43, 46-48.) He claims that it is impossible to determine whether any of the terminated employees were later rehired (*id.* ¶ 43), that one employee was mistakenly omitted from the payroll records (*id.* ¶ 46), that Veltri's declaration mistakenly identifies her as "assistant comptroller" rather than as "assistant controller," her actual title, (*id.* ¶ 47), and that the dates were not entered for one employee presumed to be on leave of absence at the time. (*Id.* ¶ 48.) Defendant disputes these factual allegations. (Def.'s Resp. 56.1 ¶¶ 43, 46-48.) Even if true, however, as discussed *infra*, Plaintiff's allegations would not create a material issue as to whether Defendant employed the requisite number of employees for purposes of the FMLA.

**Events of November 9, 1999 through November 14, 1999**

Prior to the week of November 9, 1999, Plaintiff had never informed any Jennifer Convertibles employee that he was suffering from depression. (Def.'s 56.1 ¶ 38; Pl.'s Resp. 56.1 ¶ 38.) Some time in October 1999, however, he had begun seeing a psychotherapist "again" (when he first began seeing a psychotherapist is not explained). (Def.'s 56.1 ¶ 49; Pl.'s Resp. 56.1 ¶ 49.) On Tuesday, November 9, 1999, a day on which he was scheduled to work from 10:00 a.m. until 9:00 p.m., Plaintiff was depressed and "felt panicky" at his job, consistent with the diagnosis of his therapist, Dr. Dennis Shelby.[3] (Pl.'s 56.1 ¶ 13; Def.'s Resp. 56.1 ¶ 13.) While at work at the North Avenue store that day, Plaintiff called into Defendant's voice mail system and left a message for Caplan, stating that he was closing the store early because he was "not feeling well," and that he would not be at work on Wednesday, November 10, 1999. Plaintiff then closed the North Avenue store without finding a replacement.[4] (Def.'s 56.1 ¶¶ 19-20; Pl.'s Resp. 56.1 ¶¶ 19-20; Bliss Dep. 113.) Caplan notified Good and Potempa of Plaintiff's actions. (Def.'s 56.1 ¶ 20; Pl.'s Resp. 56.1

---

[3]     This statement is uncontested, but the record does not reveal Dr. Shelby's diagnosis of Plaintiff or how it was "consistent with" Plaintiff's report.

[4]     The record does not indicate whether any other employee was scheduled to work at the North Avenue store on November 9, 1999.

¶ 20.)

Plaintiff did not work on November 10, 11, or 12, 1999, although he was scheduled to work during that period. (Def.'s 56.1 ¶ 21; Pl.'s Resp. 56.1 ¶ 21.) The parties agree that Potempa worked at the North Avenue store on November 10 and 11 because Plaintiff was out, and that Potempa told Jeslyn Debaltz, who had worked at the North Avenue store before becoming sales manager at Defendant's Broadview, Illinois location, that Potempa needed a day off because she had no assistance in the store. (Pl.'s 56.1 ¶ 14; Def.'s Resp. 56.1 ¶ 14.) On November 10 or 11, Plaintiff talked with Potempa from his parents' home in Wisconsin. (Def.'s 56.1 ¶ 23; Pl.'s Resp. 56.1 ¶ 23.) Plaintiff testified he told Potempa that he was not going to be in on November 11 or 12, that he was going to see Dr. Shelby on November 12, and that he felt that he needed to take some time off. (Bliss Dep., at 116-18.) Potempa testified that Plaintiff told her that he would call her to let her know when he could come back to work, that he was depressed, and that he was "unhappy just working at Jennifer Convertibles and that he wasn't sure what he was doing, if he was going to come back to work or not, I think." (Potempa Dep., at 81-82.) In a document dated November 11,[5] Potempa stated that she and Plaintiff discussed the fact that he was uncertain whether he wanted to return to work, and that he wanted to see if Dr. Shelby "would let him leave work on disability." (Ex. 6 to Potempa Dep.) Potempa also wrote that she asked Plaintiff to "please call" her on November 12 to let her know his plans, since she and others had to cover for the time he was out of the store. She noted, further, that "at the end of this conversation it was uncertain if [Plaintiff] was coming back to work." (Id.) Potempa testified that she thought he might be quitting or going on disability. (Potempa Dep., at 101.)

During the afternoon of November 10, 1999, Plaintiff left a voice mail message for Caplan

---

[5]     Potempa testified that she thought she had written the document just after her conversation with Plaintiff, but admitted that she may have written it during the week of November 14. (Potempa Dep., at 99-100.)

in which he stated that he was at his parents' house in Wisconsin, that he most likely would not be at work for the remainder of the week, that he was "very depressed" and "very unhappy," that it was better that he was not at work, and that he was going to meet with Dr. Shelby on November 12 to "get the proper . . . written excuse, if you need it." (Pl.'s 56.1 ¶ 15; Def.'s Resp. 56.1 ¶ 15.) Later in the afternoon of November 10, Caplan forwarded Plaintiff's message to Potempa, Good, and John Rodriguez, a general manager in the Chicago area. (Def.'s 56.1 ¶ 22; Pl.'s Resp. 56.1 ¶ 22.) After she received the voice mail, Good suggested issuing Plaintiff a written warning for closing the store without authorization. (Id.)

Plaintiff testified that, on the morning of November 12, 1999, he told his friend, Xavier Yager ("Yager"), that he was "really stressed out . . . that I felt like I needed to take some time off . . . [a]nd I didn't really know, you know, what my options were about taking, you know, extended time off or some future time off." (Bliss Dep., at 125.) He told Yager that he was going to Jennifer Convertibles to see if the schedule had been posted for the next week. Yager advised him to get his personnel handbook, and offered to look it over with Plaintiff. (Id.)

On the morning of Friday, November 12, 1999, after speaking with Yager, Plaintiff went to the North Avenue store and talked with Debaltz, who was filling in for Plaintiff at the time. (Def.'s 56.1 ¶ 24; Pl.'s Resp. 56.1 ¶ 24.) The parties dispute the substance of the conversation. Debaltz testified that, when Plaintiff came into the store on November 12, he told Debaltz that he had come in to get his personal belongings because he was quitting, that he needed his insurance information to file an insurance claim because he was depressed, that his job made him more depressed, that he was going to live in Wisconsin, that the job wasn't challenging, that he thought Jennifer Convertibles owed him money because of the way the "spiff" program was set up, that Caplan was leaving on short notice, and that Plaintiff could do the same. (Debaltz Dep., at 26-27.) She stated that he then took all of his belongings, asked Debaltz to tell Potempa to call him, and stated that Jennifer Convertibles owed him around $2,000 as repayment for the $100 it had taken out of each

of his paychecks for the "spiff" program since he had started; he observed that he didn't understand the program and that he had signed an authorization for the withholding without understanding it. (*Id.* at 27-28.) Debaltz testified that she told Plaintiff that she hoped he felt better and wished him "the best of luck." (*Id.* at 28.) She also told him that she agreed that the way the "spiff" program worked was "annoying," but that it was "something that was part of the job when you took on a job. It wasn't something that was just snuck in there like a piece of paper, like, oh, by the way, sign this." (*Id.*) She testified that Plaintiff responded with irritation to this comment. (*Id.*) Debaltz testified that she also pointed out that Caplan had probably worked his departure out with Defendant's corporate office in advance. (*Id.* at 29.) Debaltz believed she was the proper person to accept another employee's resignation because she was a manager. (*Id.* at 29-30.) Debaltz testified that, after Plaintiff left, she called Potempa at home and related her conversation with Plaintiff. (*Id.* at 30.)

On a date not specified in the record, Good told Debaltz to "write out exactly what took place" between Plaintiff and Debaltz on November 12 because Good thought Plaintiff's behavior–walking in, collecting his belongings, and quitting–was "erratic." (Good Dep., at 105.) In a handwritten memo to Good, dated November 15, 1999, Debaltz described her conversation with Plaintiff. (Debaltz Dep., at 41-42; Ex. 7 to Debaltz Dep., at 1.) Debaltz's memo is substantially consistent with her testimony. According to the memo, Plaintiff came into the store, and Debaltz asked him if he had come in to work. (*Id.*) He said "no," that he was hoping that Potempa would be there because he was sick and could not work at the store anymore, that he was "very depressed," that he was quitting because working at the store made him feel worse, that he had come to retrieve his belongings, and that he needed to find his insurance papers to give to his doctor to enable him to collect disability. (*Id.* at 1-2.) Debaltz asked him why he was quitting and he said he was overqualified for the job and needed a job that challenged him. (*Id.* at 2.) Debaltz's note referred to the exchange about Caplan's resignation: Debaltz recalled that Plaintiff stated that

Caplan had left on short notice and that he was leaving as well; Debaltz responded that Caplan had probably given his notice to corporate headquarters in advance. (*Id.*) Debaltz told him she hoped he felt better soon and wished him "best of luck" in finding a job that made him happy. (*Id.*) While they were talking, Plaintiff packed his belongings, hugged Debaltz, and asked her to have Potempa call him. (*Id.*) Debaltz also wrote that he also "mentioned that he was offered a store to manage and he said there was no way he would work at one of those other stores to make less money." (*Id.*) She ended the memo with the words, "Because it is hard for me to write all of this stuff I believe I wrote everything to the best of my knowledge." (*Id.* at 3.) In her deposition testimony, Debaltz explained that it was difficult for her to record this information because she was managing a store and helping her sales staff at the time. (Debaltz Dep., at 45-46.) She admitted that she left information out of the memo concerning the fact that Plaintiff thought Defendant was illegally taking money out of his paychecks for the "spiff" program, because "it was during the time when Michael [Bliss] wanted his job back and I liked him as a person and wanted him to have a job with Jennifer Convertibles . . . ." (*Id.* at 42.)

Plaintiff claims that Debaltz lied about what Plaintiff said in her conversation with him on November 12. (Def.'s 56.1 ¶ 26; Bliss Dep., at 209-213.) In his deposition, Plaintiff specifically denied having told Debaltz (a) that he couldn't work at the store anymore, (b) that he was quitting, (c) that working at the store made him feel worse, (d) that he came to get his belongings because he was not coming back, (e) that he needed a job that challenged him, (f) that he was there to get his insurance papers, or (g) that Caplan was leaving on short notice and that he was leaving too. (Bliss Dep., at 210-11.) He stated that Debaltz never said anything about the fact that Caplan probably gave his notice to corporate headquarters and that she did not say "best of luck finding a new job." (*Id.* at 211.) He claimed that he did not pack up all of his personal belongings. (*Id.*)[6]

---

[6]  Plaintiff testified that his personal belongings included his copy of the Jennifer
(continued...)

12

He admitted he took his personnel handbook out of the store, and that they hugged and said their goodbyes, but testified that he told her that he planned to call Potempa himself. (*Id.*) He also stated that he told Debaltz that he was going through a rough time and was planning to take some time off from work. (*Id.* at 129.) He denied telling Debaltz that he had been offered a store manager position at another store. (*Id.*)

Plaintiff testified that he believed Debaltz wrote the memo because she wanted his position, since she had formerly worked at the North Avenue store and "knew how much money she could make at that store." (*Id.* at 212.) To support this assertion, Plaintiff testified that, on a date not specified in the record, he had a conversation with Debaltz in which she had called his store and other stores "because she was really upset . . . because some customer was threatening to kick her ass, so to speak, and that's when she had said — and this person, I believe, was an African-American." (*Id.* at 214.) According to Plaintiff, Debaltz then stated that she "was sick of having to deal with the ghetto blacks . . . that came in to the store, and she was not making – it was not a busy store." (*Id.* at 213.) Plaintiff also stated his belief that, "if she was offered the position to go back [to the North Avenue store], she would want to take it in a heartbeat because of the commissions that she would get there." (*Id.*) [7]

It is undisputed that, at noon or shortly thereafter on November 12, after Plaintiff had left

---

[6](...continued)
Convertibles personnel handbook in a black three-ring notebook, his compact discs, and possibly some food, but that he only took the personnel handbook home with him on November 12. (Bliss Dep., at 143-44.)

[7]     At some point prior to these events, Caplan, Good, and Rodriguez had promised Debaltz that she could return at any time to the North Avenue store as a sales associate. (Def.'s 56.1 ¶ 9; Pl.'s Resp. 56.1 ¶ 9; Pl.'s 56.1 ¶ 6; Def.'s Resp. 56.1 ¶ 6; Debaltz Deposition (hereinafter "Debaltz Dep."), Ex. C to Pl.'s App., at 32-33.) Whether such a return would have required the involuntary transfer of another sales associate is not explained in the record. Further, neither party has offered evidence concerning Jennifer Convertibles' compensation policy or the commission structure, nor is the court able to assess whether working as a sales associate in one location might be objectively more or less desirable then any other assignment.

the store, Debaltz called Potempa at her home to inform her that Plaintiff had stopped by the store, collected his personal belongings, told Debaltz that he was quitting because he was unhappy working for Defendant, hugged Debaltz, said goodbye, and left. (Def.'s 56.1 ¶ 25; Pl.'s Resp. 56.1 ¶ 25; Potempa Dep., at 85-86, 90-91, 103-06; Ex. 7 to Potempa Dep.; Debaltz Dep., at 21-30, 41-47; Ex. 7 to Debaltz Dep.; Second Amended Complaint (hereinafter "Second Am. Compl." ¶ 16.) Plaintiff points out that Debaltz also told Potempa that Plaintiff had said that "he needed his insurance information to file an insurance claim because he was depressed and that this job made him more depressed and that he was going to go live in Wisconsin." (Pl.'s Resp. 56.1 ¶ 25; Debaltz Dep., at 27, 30.)

After Debaltz called Potempa on November 12, Potempa called Caplan. Defendant claims that Potempa told Caplan that, according to Debaltz, Plaintiff had stopped by the North Avenue store, collected his personal belongings, and quit. (Def.'s 56.1 ¶ 28; Caplan Dep., at 91.) In a statement Caplan wrote in April 2000 regarding Plaintiff's resignation addressed "To whom it may concern," Caplan described his knowledge of Plaintiff's actions on November 12 as follows: "While November 12th was my last day of employment, I was informed that Michael [Bliss] went to the showroom and collected all of his belongings and told the manager covering the showroom (Jeslyn Debaltz) that he was quitting." (Caplan Dep., at 95; Ex. 10 to Caplan Dep.) In his deposition, Caplan confirmed that Potempa did call him on November 12 and told him that Plaintiff had come in, taken his belongings, and quit.[8] (Caplan Dep., at 91.)

The parties agree that after Potempa called Caplan on November 12, 1999, Caplan and/or Potempa informed Good, who was out of the office that day, that Debaltz had told them that Plaintiff had stopped by the North Avenue store, collected his personal belongings, told Debaltz he

---

[8]     Plaintiff notes that Caplan did not mention Debaltz by name in the cited portion of Caplan's deposition testimony (Pl.'s Resp. 56.1 ¶ 28; Caplan Dep., at 91), but the fact is not relevant; Caplan mentioned Debaltz by name in his April 2000 written statement.

was quitting, hugged Debaltz, said goodbye, and left. (Def.'s 56.1 ¶ 29; Pl.'s Resp. 56.1 ¶ 29.) It

is also undisputed that, during that same afternoon, Potempa and Good discussed staffing options

for the North Avenue store, including the possibility of transferring Debaltz from the Broadview

store to the North Avenue store, and that they decided at that time to offer the sales associate

position at the North Avenue store to Debaltz. (Def.'s 56.1 ¶ 30; Pl.'s Resp. 56.1 ¶ 30.) Ten to

fifteen minutes after her conversation with Debaltz, Potempa called Kim Good to discuss the

situation. (Potempa Dep., at 91.) Debaltz, Potempa, and Good all gave consistent descriptions

of Debaltz's account of her conversation with Plaintiff. Potempa summarized her conversation with

Good as follows:

> Let's get somebody to cover the sheet.[9] Well, who do you want? Jeslyn [Debaltz],
> I know she showed an interest in coming back. This is all in like a 10-minute
> conversation. Well, definitely get Jeslyn back there. It was kind of like let's get the
> position filled. Jeslyn is a really good salesperson, so she would be perfect for that
> store.

(*Id.*) Potempa also testified that, within an hour of talking to Good, she telephoned Plaintiff,

although she does not believe she spoke with him. (*Id.* at 91-92.) On November 12 or 13,

Potempa wrote a note stating that Plaintiff was originally scheduled to work from 10:00 a.m. until

5:00 p.m., that at approximately 11:30 or 12:00 noon he entered the store and gathered all of his

belongings, that he told Debaltz that he was resigning, that he told her to inform Potempa that he

would call her later that day with an explanation, that Debaltz called her at approximately 12:30

p.m. and informed her that Plaintiff had resigned, and that Plaintiff never called Potempa that day.

(Ex. 7 to Potempa Dep.) It is undisputed that Potempa believed that Plaintiff was unhappy working

for Jennifer Convertibles and believed that he thought he "should be doing something more with

his life and that he no longer wanted to work at Jennifer Convertibles." (Def.'s 56.1 ¶ 27.)

Plaintiff does not dispute Defendant's assertion that Good and Potempa were the sole

---

[9]     Potempa did not indicate what she meant by the term "sheet."

decisionmakers responsible for deciding how to handle Plaintiff's alleged separation from Jennifer Convertibles and the selection of his replacement at the North Avenue store. (Def.'s 56.1 ¶ 31; Pl.'s Resp. 56.1 ¶ 31.) Good stated in her declaration, "In filling Bliss'[s] position . . . I relied upon and acted based upon information that was provided to me that Bliss had voluntarily resigned his employment on November 12, 1999." (Good Decl. ¶ 4). Likewise, Potempa stated in her declaration, "In filling Bliss'[s] position . . . I relied upon and acted based upon information that was provided to me from Jeslyn Debaltz that Bliss had voluntarily resigned his employment on November 12, 1999." (Potempa Decl. ¶ 3.)

Plaintiff testified that after he visited the North Avenue store on November 12, he telephoned Sandra Sarcona ("Sarcona"), Defendant's Director of Human Resources at her office at Defendant's corporate headquarters in Woodbury, New York and told her that he "wanted to request some forms" because he was "looking into what his options were" and "requested forms for taking a medical leave off." (Def.'s 56.1 ¶ 12; Pl.'s 56.1 ¶ 12; Bliss Dep., at 57-58.) Plaintiff claims that Sarcona mailed him an FMLA form on November 12 which specifically outlined the FMLA statute to enable employees to access FMLA leave. (Pl.'s 56.1 ¶ 36.) Although it contests FMLA coverage, Defendant admits that the form that Sarcona sent Plaintiff summarized certain sections of the FMLA. (Def.'s 56.1 ¶ 36.)

Defendant contends that neither Potempa nor Good was aware of any type of medical leave—other than sick days—or any type of accommodation that Plaintiff requested from Defendant, and that Plaintiff in fact never requested any type of medical leave other than sick days. (Def.'s 56.1 ¶ 35; Good Decl. ¶ 7; Potempa Decl. ¶ 5.)[10] Plaintiff responds that "Good and Potempa were aware that Bliss was in the process of requesting accommodation to his employment, including sick days and FMLA leave." (Pl.'s Resp. 56.1 ¶ 35.) Plaintiff cites his own testimony that, on November

---

[10]     Defendant does not mention whether Potempa and Good were aware of Plaintiff's *need* for leave, as opposed to a mere *request* for leave.

10, 1999, he told Potempa that he was at his parents' house, that he would not be at work on Thursday, November 11 or Friday, November 12, that he was going to see his therapist that week, that he was "really stressed out" and felt that he needed to take some time off. (Bliss Dep., at 117-18.) He also testified that, on November 12, 1999, he told Debaltz that he wanted to get his personnel handbook, that he "was just going through, you know, kind of a rough time right now, and that I was looking into maybe taking some time off work." (*Id.* at 129.) He also cites Debaltz's deposition, in which she testified that he told her on November 12 that he needed his insurance information to file an insurance claim because he was depressed, and that she related her conversation with Plaintiff to Potempa later on November 12. (Debaltz Dep., at 27, 30.) In addition, he cites Good's deposition, which includes the transcription of a November 10 voice mail message that Good appended to a message from Plaintiff and sent to the voice mail system "save box" in which Good stated,

> Here's the message from Michael Bliss. I still believe that he should be written up for [inaudible] failure for [inaudible] vacation and leaving the showroom or closing the showroom without authorization. But he obviously has some serious mental and health issues that I'll talk to John and Wayne and Trish about it. We're going to have – He's going to have to obviously provide documentation for all this, but I don't know what his therapist is going to say, whether it would be tied to – that he could go out on disability or something like that. Here's the message.

(Good Dep., at 113-14.)

On the morning of November 13, 1999, Plaintiff explained to Dr. Shelby that he "felt real panicky" and expressed feelings of wanting to flee. (Def.'s 56.1 ¶ 49; Pl.'s Resp. 56.1 ¶ 49.) Plaintiff testified that he also told Dr. Shelby that he felt "a lot better" because he had spent a couple of days at his parents' house and "thought things through" and that he was "going back to work." (Bliss Dep., at 148-49.) After the appointment, he had breakfast with a friend, Mark Tenuta, and told Tenuta that he had taken a few days off from work, that he "was stressed out" and that he was planning to go back to work on Sunday, November 14, but that if he needed to take time off in the future, he needed to know "what [his] options were." (*Id.* at 150.)

After Plaintiff's appointment with Dr. Shelby on November 13, Plaintiff telephoned Potempa at the North Avenue store and informed her "that he was ready and able to return to work." (Def.'s 56.1 ¶ 32; Pl.'s Resp. 56.1 ¶ 32.) Plaintiff added that he told Potempa that he wanted to get the schedule for the following week. (*Id.* at 154, 217.) Defendant claims that Plaintiff added that he would return to work "at least until he found another job." (Def.'s 56.1 ¶ 32; Potempa Dep., at 78, 95-98, 106-11; Exs. 8-9 to Potempa Dep.; Bliss Dep., at 152-56, 190, 217-19.) Plaintiff denies referring to another job. (Pl.'s Resp. 56.1 ¶ 32; Bliss Dep., at 152-56, 190, 217-19.) The parties agree, however, that Potempa responded that she thought that Plaintiff had told Debaltz on November 12 that he was unhappy working for Defendant, that he had quit, that he had taken all of his personal belongings, and that he had left the store. (Def.'s 56.1 ¶ 32; Pl.'s Resp. 56.1 ¶ 32.) It is also undisputed that Potempa told Plaintiff that she would speak to Good about whether Plaintiff could return to the North Avenue store, but that this was unlikely since his former position had been filled. (*Id.*) Defendant claims that Potempa then told Plaintiff "that she thought he would be able to return to work at a different location in the Chicago area," and that Plaintiff responded that he was not interested in working at any location other than the North Avenue store. (Def.'s 56.1 ¶ 32.; Potempa Dep., at 78, 95-98, 106-11; Exs. 8-9 to Potempa Dep.; Bliss Dep., at 152-56, 190, 217-19.) Plaintiff responds that he "was never offered any job at a different location in the Chicago area." (Pl.'s Resp. 56.1 ¶ 32.) Defendant acknowledges that there was no formal offer of another position, but Plaintiff does not dispute that Potempa discussed the likelihood that such a position might be available, and that he responded to the suggestion with disinterest. (Def.'s Reply 56.1 ¶ 32.)

Defendant asserts that Plaintiff was not planning to request a leave of absence on November 12, (Def.'s 56.1 ¶ 36), noting Plaintiff's deposition testimony that when he called Potempa on November 13, 1999, he "was planning to come back to work on Sunday [November 14, 1999]." (Def.'s Reply 56.1 ¶ 36.) Plaintiff's response is equivocal: he states that

18

he did not know on or around November 12 whether he was requesting a leave of absence, and was "investigating his options" by obtaining his Sales Associate Handbook and contacting Sarcona. (Pl.'s Resp. 56.1 ¶ 36.)

The parties dispute the date on which Defendant in fact "filled" Plaintiff's position at the North Avenue store. Plaintiff claims that the position was filled on November 14, after Plaintiff "had informed Potempa that he never voluntarily resigned his employment." (Pl.'s Resp. 56.1 ¶ 31.) Defendant asserts that "it is unclear what day between November 12-14, 1999 Debaltz accepted the offer to transfer to the North Avenue store to fill Plaintiff's former position," but claims the date on which she accepted the position is not material, since (they claim) it is undisputed that Good and Potempa offered her the position on November 12. (Def.'s Reply 56.1 ¶ 31.) Plaintiff cites Debaltz's deposition; but the court notes that Debaltz did not indicate when Potempa and Good offered her the position. (*See* Debaltz Dep., at 27, 30.) Plaintiff also cites his own deposition, although in the cited portion Plaintiff states only that Potempa had told him on November 13 that his position "had been filled." (Bliss Dep., at 154.) Finally, Plaintiff points to Good's testimony that Potempa and she "made plans to cover" the North Avenue store after Plaintiff said he had quit sometime between November 12 and November 14. (Good Dep., at 136.) Neither of these statements supports Plaintiff's contention that his position was not filled until November 14. Debaltz testified that Potempa and Good offered her Plaintiff's job on Saturday, November 13, and that she accepted the position on Sunday, November 14.[11] (Debaltz Dep., at 44.) The court concludes from this evidence, drawing inferences in favor of Plaintiff, that Potempa and Good decided to offer Debaltz the job on November 12 but did not offer her the position until November 13 (rather than on November 12 as Defendant claims), and that Debaltz accepted the position on

---

[11]    Debaltz testified that one day passed between the date Plaintiff quit and the date she was offered the job, and that it took her one day to consider whether to take the job. (Debaltz Dep., at 44.)

November 14. As previously discussed, the record also shows that Plaintiff called Potempa on November 13 and told her he was "ready and able" to return to work. What is not clear, however, is whether Potempa and Good offered Debaltz Plaintiff's position before or after Plaintiff spoke with Potempa about returning to work.

It is undisputed that, on November 15, 1999, Potempa spoke to Good about Plaintiff's request to return to his job at the North Avenue store, that they decided that he could not return because they had already replaced him with Debaltz, and that Potempa informed Plaintiff of their decision. (Def.'s 56.1 ¶ 33; Pl.'s Resp. 56.1 ¶ 33.) According to Defendant, Potempa then told Plaintiff that he could return to another store, (Def.'s 56.1 ¶ 33) but Plaintiff insists, citing his own deposition testimony, that he was never offered any job at a different location in the Chicago area. (Pl.'s Resp. 56.1 ¶ 33.) Potempa testified that she told Plaintiff that the corporate office or Good had confirmed that he could not return to working at the North Avenue store, but that they could discuss working at another location if he was interested, and that Plaintiff responded, as he had two days earlier, by saying that he was not interested. (Potempa Dep., at 112.) The testimony is consistent with a note that Potempa wrote by hand on November 15: "I . . . asked Michael once again if he would like me to look into whether or not there was another position available for him at another showroom. He replied, 'No.'" (Ex. 10 to Potempa Dep.)

On November 16, 1999, Potempa completed and signed a "Sales Employee Change of Status Form" regarding Plaintiff. (Potempa Dep., at 114-17; Ex. 11 to Potempa Dep.) As the "Reason for Change," Potempa checked the box marked "Termination"; as the "Detailed Reason," she wrote, "Came into showroom 11-12 and gave notice & left." (*Id.*) Potempa did not check the "Resignation" box. (*Id.*) Good signed the form on behalf of the Personnel Department on November 22, 1999. (*Id.*) Potempa testified that she filled out and signed the form on November 16, but dated it November 15, and acknowledged that she did not know why she "predated" the form. (Potempa Dep., at 116.) Potempa also marked the "Code" with "0100," which

Good testified meant "Quit no reason" and is reported to the unemployment insurance company. (Ex. 11 to Potempa Dep.; Good Dep., at 20, 70.) Good testified that, on Change of Status Forms, her only concerns were the detailed reason and the code. (Good Dep., at 64.) Good also stated that "it was a termination, yes, quit, resignation." (Good Dep., at 70.) The parties agree that Good misspoke initially when she said "termination," although Plaintiff claims she was admitting that he was terminated before changing her answer. (Pl.'s 56.1 ¶ 26; Def.'s Resp. 56.1 ¶ 26.)

It is undisputed that, during the week of November 15, 1999, Good informed Sarcona that Plaintiff had quit and that Sarcona should send him the appropriate forms. (Def.'s 56.1 ¶ 34; Pl.'s Resp. 56.1 ¶ 34.) The parties also agree that, during their November 12-15 discussions about Plaintiff's employment status, Potempa and Good were unaware of any communications Plaintiff had with Sarcona regarding the types of leave available to him or other matters. (Id.) The parties also agree that a general manager must consult with the regional manager or Vice President of National Sales before discharging an employee, and that sales managers do not have authority to terminate employees. (Def.'s 56.1 ¶¶ 9-10; Pl.'s Resp. ¶¶ 9-10.) Following his departure from Jennifer Convertibles, Plaintiff applied for several jobs and asserted on his employment applications that he had quit his job with Jennifer Convertibles. (Def.'s 56.1 ¶ 50; Pl.'s Resp. 56.1 ¶ 50.)

On January 17, 2000, Plaintiff left a voice mail message for Potempa in which Plaintiff asked Potempa why he had not been paid for November 10-12, 1999. (Good Dep., at 123-25.) On a date not specified in the record, Potempa forwarded the message to Good and introduced it to Good by stating,

> I'm assuming – I mean basically what we would do is explain the fact that he had never called in sick, that he basically just didn't let us know what he was doing for the next few days and that we shouldn't be responsible for paying him for those days. Just so you know like on the last week that he had worked, you know, I wrote on there only pay for one day because he came in on – he had off on Monday, and on Tuesday he came in from 10 until 2 o'clock and then closed the store. . . . Let me know . . . if in fact we should be paying him for that week.

(*Id.* at 123-24.) Potempa testified at her deposition that she did not remember hearing a voice mail message from Plaintiff to Caplan, that she did not remember disputing whether Plaintiff should be paid for his sick days for the period November 9-12, and that she thought he should get paid for those sick days. (Potempa Dep., at 94, 120.)[12] Plaintiff's attendance record, completed by Potempa, indicates that he used sick leave on November 9, 1999, but does not indicate that he took any leave after that date. (Ex. 21 to Good Dep.) Good was uncertain why November 10-12 were not marked as "illness" (sick leave) on the form. (Good Dep., at 130-31.) In fact, however, Plaintiff was paid for November 10-12, the days he called in sick. (Good Dep. at 124.)

Defendant claims that Caplan, Potempa, Pedro Yanga ("Yanga"), who was manager of the Diversey store in early 1998, and Tricia Knight ("Knight"), who replaced Yanga as manager of the Diversey store, all were aware of Plaintiff's HIV status and that all of them were "very supportive" of him regarding his HIV status. (Bliss Dep., at 45; Def.'s 56.1 ¶ 37.) Citing Plaintiff's own testimony, Defendant also points out that none of its employees said anything critical to Plaintiff about his HIV status, and that Plaintiff never thought that other employees were uncomfortable in his presence. (*Id.*) Plaintiff nevertheless asserts that Potempa participated in Plaintiff's termination "for discriminatory reasons connected with his HIV status in violation of federal law." (Pl.'s Resp. 56.1 ¶ 37.) He acknowledges, however, that Yanga, Knight, and Potempa were all "supportive" when Plaintiff needed to take time off for doctor's appointments. (Bliss Dep., at 45, 54-56.) He also stated that, shortly after he started working at the North Avenue store in July 1999, he told Kenric Garber ("Garber"), manager of the store,[13] that he was HIV-positive, so that Garber would know if something happened to Plaintiff such as an injury or if he needed to take time off for a

_____

[12]     Plaintiff characterizes this testimony as "lies," (Pl.'s 56.1 ¶19), but the court is not prepared to assume that a faulty or inaccurate memory is evidence of wilful dishonesty.

[13]     The record does not indicate when Garber started or ended his tenure as manager of the North Avenue store.

doctor's appointment; that Garber told Caplan about Plaintiff's HIV status; that Caplan was "very familiar" with it since his brother was HIV-positive; that Caplan periodically asked Plaintiff how he was doing; and that Caplan was supportive. (*Id.* at 52-54, 93.) He also admitted that the managers whom he told about his HIV status did not inquire or "probe" Plaintiff about it and that he never got the sense, "either in words or in vibes," that they were uncomfortable with him or "didn't want [him] around." (*Id.* at 94.) Plaintiff also stated that he disagreed with Caplan's assessment in his April 2000 written statement that Plaintiff was treated "differently," i.e., better than, other employees, because, in Plaintiff's view, he was "fired." (*Id.* at 229.)[14]

## DISCUSSION

Defendant moves for summary judgment on Plaintiff's claims. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002). In determining that there are no genuine issues of material fact, the court must construe all facts in the light most favorable to the party opposing the motion and draw all justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Plaintiff brings three counts against Defendant. Count I asserts that Defendant interfered with his rights under the FMLA. (Second Am. Compl. ¶ 31.) Count II alleges that

---

[14]    In addition to his testimony, Plaintiff cites his entire Second Amended Complaint as evidence that Potempa participated in Plaintiff's termination for unlawful discriminatory reasons, although he does not cite a particular section of the complaint. (Pl.'s Resp. 56.1 ¶ 37.) Defendant points out, correctly, that Plaintiff may not cite his complaint as evidence on a motion for summary judgment. (Def.'s Reply 56.1 ¶ 37; *see* FED. R. CIV. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading."); *Monroe v. Children's Home Ass'n of Illinois*, 128 F.3d 591, 593-94 (7th Cir. 1997). Defendant points out that in any event Plaintiff admitted in his complaint that Debaltz "misinformed" Potempa that Plaintiff had quit his job. (Def.'s Reply 56.1 ¶ 37, citing Second Am. Compl. ¶ 16.)

Defendant discriminated against Plaintiff in violation of the ADA. (*Id.* ¶¶ 46-47.) Count III contends that Defendant breached "written and oral contracts regarding medical leave request between Plaintiff and Defendant and the custom and practice of Defendant." (*Id.* ¶ 54.) The court addresses each claim in turn.

## A.     Family & Medical Leave Act Claim

Plaintiff alleges that Defendant interfered with his rights under the FMLA by terminating him after he inquired about taking FMLA leave. The FMLA makes it unlawful for any employer to interfere with an employee's exercise or attempted exercise of rights granted to him by the Act, or to discharge or in any other manner discriminate against him for opposing any practice made unlawful by the Act. 29 U.S.C. § 2615(a). An employee does not qualify for the protection of the FMLA until he has provided the employer "with enough information to put the employer on notice that FMLA-qualifying leave is needed." *Stoops v. One Call Communications, Inc.*, 141 F.3d 309, 312 (7th Cir. 1998) (citations omitted). It does not matter whether the employee mentions the Act or demands its benefits in his request. *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 382 (7th Cir. 2003).[15] Leave under the Act is unpaid, except to the extent that the employee has accrued medical or vacation leave. *Id.*

In his Second Amended Complaint, Plaintiff alleges that Defendant terminated him "before he could even request his [FMLA] leave" (Second Am. Compl. ¶ 31), and in his brief, states that "Bliss alleges in his complaint that he was terminated in violation of the anti-discrimination provision of the Act, when he began the process of determining his FMLA rights." (Plaintiff's Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment (hereinafter "Pl.'s Supp.

---

[15]      The *Byrne* court noted that, if an individual with "major depression" were unable to tell his employer about his problem and requested leave, then notice would not be feasible and would be unnecessary. *Byrne*, 328 F.3d at 382. Plaintiff here has argued not that he was unable to request leave, but that his request for information put Defendant on notice of his need for medical leave.

Mem."), at 2.) As the court understands his claim, Plaintiff asserts that he notified Defendant of his need for leave on November 12, 1999, when he telephoned Sandra Sarcona and told her that he "wanted to request some forms" because he was "looking into what his options were" and "requested forms for taking a medical leave off." (Bliss Dep., at 57-58.) Assuming that Plaintiff's request for information concerning medical leave constitutes sufficient notice for purposes of the FMLA, the court concludes his claim nevertheless fails: Plaintiff is not an "eligible employee" because Defendant is not covered by FMLA.

In order to be covered by the FMLA, the employer must employ at least 50 employees within 75 miles of the employee's worksite. 29 U.S.C. § 2611(2)(B)(ii); *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1136 (7th Cir. 2001). The requisite number of employees is based on the number of employees maintained on the payroll, 29 C.F.R. § 825.111(c), and is determined "when the employee gives notice of the need for leave," here, on November 12, 1999. 29 C.F.R. § 825.110(f). Defendant's payroll records for the two-week pay period beginning November 8, 1999 and ending November 21, 1999 clearly indicate that as of November 12, Defendant had 30 employees on "active" status and one employee on a leave of absence. (Ex. A to Veltri Decl.) In addition, the payroll records identify 19 additional employees who were separated from Defendant between January 1, 1999 and November 21, 1999. (Good Dep., at 83.) Of those 19 employees, two–Caplan and Plaintiff–had a termination date of November 12, 1999, during the pay period, while the remaining 17 terminated employees had termination dates between January 11, 1999 and November 8, 1999, the start of the relevant pay period, including four "terminated" employees who were paid some combination of their draw, commission, and "spiff" payments during the pay period. (*Id.*; Veltri Decl. ¶ 7.)

Plaintiff claims that, because there are 50 employees on the payroll record in question, Defendant employed 50 individuals in the Chicago region, rather than 31. (Pl.'s Resp. 56.1 ¶ 40.) He argues that the "payroll method," endorsed by the Supreme Court in *Walters v. Metropolitan*

*Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997), supports this conclusion. (Pl.'s Supp. Mem., at 3.)

The district court in *Walters* dismissed a Title VII action for lack of subject matter jurisdiction on grounds that the company employed fewer than 15 employees, the requisite number under Title VII, because it compensated fewer than 15 employees each working day for most of the year. *Id.* at 204. The Supreme Court reversed the dismissal, holding that the "ultimate touchstone" under Title VII was whether the employer had "an employment relationship" with at least 15 individuals for each working day in 20 or more weeks during the year in question:

> The test for when an employer 'has' an employee is no different from the test for when an individual *is* an employee: whether the employer has an employment relationship with the individual on the day in question. This test is generally called the 'payroll method,' since the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll.

*Id.* at 206.

The Court noted that the Department of Labor ("DOL") has adopted the payroll method for determining the number of employees under the FMLA. *Id.* at 207, citing 29 C.F.R. § 825.105(b)-(d). DOL regulations explain that "[a]ny employee who appears on the employer's payroll will be considered employed each working day of the calendar year, and must be counted whether or not any compensation is received for the week." 29 C.F.R. § 825.105(b). The regulations explain, further, however, that "[i]f there is no employer/employee relationship (as when an employee is laid off, whether temporarily or permanently) such individual is not counted." 29 C.F.R. § 825.105(c); *see also Grimsley v. Fiesta Salons, Inc.*, 2003 WL 117985, *6 (E.D. Mich. Jan. 7, 2003) ("[I]f the employee no longer works for the employer at the time the plaintiff requests FMLA benefits, that employee should not be included in the tally.").[16]

---

[16]    Plaintiff also points to Judge Easterbrook's concurring opinion in *EEOC v. Sidley Austin Brown & Wood*, where the court was faced with a question regarding the proper treatment of lawyers who were reported in the payroll records but were not actually paid a salary and instead were compensated by sharing in the firm's profits and losses. Judge Easterbrook interpreted the holding in *Walters* to mean that "for the purposes of determining whether the employer exceeds
(continued...)

In this case, Plaintiff contends the court must consider persons reported in the payroll records as "terminated" to be employees. The court is unwilling to conclude that all of the employees listed as "terminated" nevertheless maintained an employment relationship with Defendant. Even were the court to consider Plaintiff and Caplan, who were "terminated" on November 12, and the four "terminated" employees who were paid some combination of their draw, commission, and "spiff" payments during the pay period, to be "active" employees, Defendant could only be considered to be in an ongoing relationship with 37 employees on that date—13 less than the threshold required under the Act.

Plaintiff also suggests that there "may have been significant errors in the records regarding entry, transmission, and review." (Pl.'s Mem., at 4.) In his 56.1 Statement, Plaintiff asserts that it is impossible to determine whether any of the terminated employees were rehired. (Pl.'s 56.1 ¶ 43). He also cites alleged errors in the records, including the facts that one employee was mistakenly omitted from the payroll records (*id.* ¶ 46), that Veltri was listed as "assistant comptroller" in her declaration (*id.* ¶ 47), and that the dates were not entered for one employee presumed to be on leave of absence at the time. (*Id.* ¶ 48.) Even resolving each of these discrepancies in favor of Plaintiff, however, they do not call into doubt Defendant's assertion that 13 former employees had no continuing employment relationship with the company as of November 12, 1999. In the court's view, Plaintiff has not offered evidence that creates a dispute of fact on the issue of whether Defendant had the requested number of employees to be bound by the FMLA. *Cf. Wilson v. Comtrust LLC,* 249 F.Supp.2d 993, 997 (N.D. Ill. 2003) (plaintiff bears

---

[16](...continued)

the statutory size threshold an 'employee' is a person on the firm's payroll at a given time, whether or not that person is paid for the date used in measurement." 315 F.3d 696, 711 (7th Cir. 2002) (Easterbrook, J., concurring). He stated that it was irrelevant "what names state law (or particular employers) give" to the employee's attributes. *Id.* In the court's view, *Sidley* does not address this case, where there is no dispute that persons working for Defendant were "employees."

the burden of proving the number of employees in Title VII cases under the "payroll method").[17]

Plaintiff contends, in the alternative, that Defendant contractually agreed to be bound by the FMLA. (Pl.'s Supp. Mem., at 4-6.) He cites *Thomas*, 251 F.3d at 1137, for the proposition that an employer "can contractually agree to FMLA coverage." In *Thomas*, the court found that the defendant company's Summary Plan Description of Employee Benefits ("SPD") established a procedure for employees to follow when requesting leave under the Act, and therefore acted as if the SPD itself created the right to request leave under the FMLA, even though the plaintiff was not statutorily eligible. *Id.* Plaintiff contends that Defendant contractually agreed to FMLA coverage through its employee handbook. He overlooks the fact, however, that the *Thomas* court did not hold that the SPD created a "backdoor" right to coverage under the Act itself. Instead, the court held that the language of the SPD "created an enforceable contract" under Illinois common law granting Plaintiff rights under the Act because "the traditional elements of contract formation [we]re present." *Id.* at 1136-37. As discussed *infra*, in this case, Defendant's employee handbook did not create an enforceable contract.[18] Because Defendant maintained an ongoing relationship with, at most, 37 employees within 75 miles of Plaintiff's worksite on November 13, 1999, Plaintiff does not qualify as an "eligible employee" under the Act.

---

[17]    Plaintiff cites an out-of-Circuit case, *Tyler v. International Brotherhood of Electrical Workers*, in which the court presumed that each individual appearing on the payroll was actually an employee because defendant "failed to demonstrate that any of the individuals listed on its payroll did not have an employment relationship with it under agency law." 2000 WL 17839, *2 (E.D. La. 2000). *Tyler* is distinguishable from this case, however, because Jennifer Convertibles has demonstrated that 13 of the individuals listed on the payroll had no employment relationship with it.

[18]    The parties dispute the significance of cases in two Courts of Appeals grappling with the question whether an employer's contractual agreement to provide employees with benefits equal to or more generous than the FMLA creates a cause of action under the Act, where the employee was not otherwise covered by the Act. *See Borner v. Zale Lipshy Univ. Hosp.*, 2002 WL 449576, at *5 (N.D. Tex. Mar. 20, 2002); *Dolese v. Office Depot, Inc.*, 231 F.3d 202, 203 (5th Cir. 2000); *Douglas v. E.G. Baldwin & Assocs., Inc.*, 150 F.3d 604, 608 (6th Cir. 1998). Because the parties here never formed a valid contract, however, the court need not examine this issue.

Plaintiff also avers that, even if he does not qualify as "eligible employee" because Defendant was not covered under the Act, he is entitled to relief because Defendant retaliated against him. (Pl.'s Supp. Mem., at 6-7.) To establish a retaliatory discharge claim under the FMLA, an employee must demonstrate that he engaged in an activity protected by the FMLA. *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999). Plaintiff notes that courts have held that an employee who fails to prove a discrimination claim may still prevail on a claim that his employer retaliated against him for complaining about discrimination. *See, e.g., Place v. Abbott Labs.*, 215 F.3d 803, 806 (7th Cir. 2000) (citation omitted). Unlike the FMLA, however, the civil rights statutes expressly prohibit retaliation. *See, e.g., Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 612 (7th Cir. 2001) (Age Discrimination in Employment Act); *Place*, 215 F.3d at 804 (Title VII); *Douglas v. General Motors Corp.*, 982 F. Supp. 1448, 1452 (D. Kan. 1997) (ADA).

As Plaintiff notes, at least one court has interpreted language in the FMLA as expressing an "anti-discrimination component similar to Title VII, the ADA, and the ADEA . . . . that prohibits an employer from discriminating or retaliating against an employee who requests or takes medical leave pursuant to the statute." *Snelling v. Clarian Health Partners, Inc.*, 184 F.Supp.2d 838, 846 (S.D. Ind. 2002), citing 29 U.S.C. § 2615(a)(2). The *Snelling* court did not state that an employee who is otherwise ineligible for the protections of the FMLA could nevertheless bring a claim for discrimination or retaliation for attempting to access FMLA benefits, however. Further, there is ample authority for the contrary proposition, namely, that one cannot bring a claim for retaliation under the Act in response to a request for FMLA leave if one is ineligible for FMLA leave. *See, e.g., Sewall v. Chicago Transit Auth.*, No. 99 C 8372, 2001 WL 40802, *8 (N.D. Ill. Jan. 16, 2001) ("Since [plaintiff's] leave was not covered by the FMLA, [defendant] could not have retaliated against [plaintiff] for taking FMLA leave."); *Theole v. United States Postal Serv.*, 996 F.Supp. 818, 821 n.1 (N.D. Ill. 1998) ("To state a claim for retaliation under the FMLA, the plaintiff must first establish he or she was protected by the FMLA at the time the leave was taken."), citing *Delgado*

*v. Solopak Pharms., Inc.*, No. 96 C 7397, 1997 WL 403703, * 3 (N.D. Ill. July 15, 1997); *see also Morehardt v. Spirit Airlines, Inc.*, 174 F.Supp.2d 1272, 1281 (M.D. Fla. 2001) ("Where the employee takes leave, or requests to take leave, that he is not eligible for . . . the employee cannot be deemed to have engaged in protected activity and, therefore, termination by the employer in such a circumstance cannot be grounds to support a retaliation claim under the FMLA.") (collecting cases).

Because Plaintiff is not an "eligible employee" for purposes of the FMLA, he cannot maintain a claim pursuant to the Act, and summary judgment will be granted as to Plaintiff's FMLA claim.[19]

## B.   Americans with Disabilities Act Claims

Plaintiff also alleges that Defendant discriminated against him in violation of the Americans with Disabilities Act. To establish a prima facie case of disability discrimination, Plaintiff must first show that (1) he is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he has suffered from an adverse employment decision because of his disability. *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 483 (7th Cir. 2002) (internal citation). Plaintiff alleges that he is a qualified individual with two disabilities (HIV and depression) within the meaning of the ADA, (Second Am. Compl. ¶¶ 41-42), and Defendant concedes that Plaintiff is a qualified individual with a disability "for purposes of this motion." (Defendant's Memorandum in Support of Motion for Summary Judgment (hereinafter "Def.'s Mem."), at 6 n.4.) Thus, the court will proceed on the assumption that Plaintiff is disabled and that he is a qualified individual with a disability within the meaning of the ADA. *See Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001) (accepting parties' agreement that plaintiff was disabled without discussion). Although it is not entirely clear,

---

[19]     Because Plaintiff is not an "eligible employee" within the meaning of the FMLA, the court need not decide whether Plaintiff in fact requested FMLA leave or was denied such leave. The court notes, however, that although Plaintiff contacted Sarcona on November 12 requesting forms for taking leave, on November 14 he advised Potempa that he was ready to return to work.

Plaintiff appears to argue that the adverse employment action he suffered was denial of access to a medical leave of absence when Defendant allegedly terminated him. (Second Am. Compl. ¶¶ 43-46.) A denial of medical leave can constitute an adverse employment action. *Ekerman v. City of Chicago*, 2003 WL 1193262, *4 (N.D. Ill. Mar. 13, 2003).

Once Plaintiff has established that he is a qualified individual with a disability, he may show that his employer discriminated against him in either of two ways: by presenting evidence of disparate treatment or by showing a failure to reasonably accommodate. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001). Plaintiff essentially brings both a disparate treatment claim and a failure to accommodate claim when he alleges that, "[b]y refusing to reasonably accommodate Plaintiff's disabilities and/or provide rights and privileges provided to non-disabled employees, Defendant discriminated against Plaintiff in violation of [the ADA]." (Bliss Compl. ¶ 45.) For the reasons stated *infra*, Defendant's motion for summary judgment will be denied as to Plaintiff's disparate treatment claim and granted as to his failure to accommodate claim.

### 1.     Disparate Treatment Claim

In a disparate treatment claim, an employee must show that he was treated differently than other workers on the basis of his disability. *Hoffman*, 256 F.3d at 572. Since Plaintiff has proffered no direct evidence linking his denial of medical leave with his disabilities, he must prove discrimination indirectly. *Id.* Courts should evaluate an indirect discrimination claim using the *McDonnell Douglass* burden-shifting approach. *Id.*, citing *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973). The *McDonnell Douglass* test is a flexible one. *Flores v. Preferred Technical Group*, 182 F.3d 512, 515 (7th Cir. 1999). In this case, the most hotly-contested issue is whether Plaintiff resigned from his position or was terminated by Defendant. Defendant is correct that there is no dispute that Potempa and Good believed he had resigned on November 12. Defendant has also presented unrebutted evidence that Potempa and Good decided on that same day to offer Plaintiff's job to Jeslyn Debaltz. Although the parties have not focused on the question, this court

is not prepared to conclude that, if Defendant had already offered Debaltz the position at the time Plaintiff called to say that he still wanted it, the law would require Defendant to withdraw the offer.

The court is unable to determine from this record, however, precisely when that offer was made. Debaltz recalled that she was not offered Plaintiff's position until November 13, not November 12 as Defendant claims. At some point on that same day, Plaintiff called Potempa and told her he was "ready and able" to return to work and Potempa responded that his position "had been filled." The key question is: which came first, the phone call or the offer? Neither party has attempted to answer this critical question.

If Potempa and Good did not offer Debaltz's the position until after Plaintiff's call, the court believes there is evidence from which a jury could reasonably conclude that Potempa and Good were in fact motivated by his disabilities, rather than by their belief that he had resigned, when they offered his position to Debaltz: Plaintiff informed Defendant's managers on November 10, 1999 that he was going to see his therapist. In her voice mail message, Good commented that Plaintiff had "some serious mental and health issues" and that he "could go out on disability." Potempa expressed her belief that Plaintiff should not be paid sick leave for the period November 9-12 and did not mark his attendance records as "sick leave" for those dates. Potempa filled out (and Good approved) Plaintiff's change of status form to reflect that he was discharged. Plaintiff told Debaltz on November 12 that he needed insurance information to file an insurance claim because he was depressed. Finally, Plaintiff requested forms for medical leave from Sarcona. Each of these facts is demonstrated in the record. (*See* Ex. 6 to Potempa Dep.; Pl.'s 56.1 ¶ 15; Def.'s Resp. 56.1 ¶ 15; Good Dep., at 113-14, 123-24; Bliss Dep., at 57-58.) Although Plaintiff has offered no evidence to suggest that Potempa and Good were aware of his request to Sarcona for medical records, the remaining evidence regarding Defendant's knowledge of Plaintiff's disabilities and his potential need for future medical leave, if true, could lead a trier of fact to conclude that Potempa and Good were mindful of his disabilities and acted on that knowledge when they moved to replace

him. (*See* Pl.'s Mem., at 9-10.)

The remaining factual dispute is a narrow one, and the court notes that there is substantial circumstantial evidence that is inconsistent with any finding of discriminatory animus. Defendant invariably allowed its employees to take personal or medical leave when necessary. Plaintiff acknowledges that several employees of Jennifer Convertibles, including Potempa, knew of his HIV-positive status and were supportive. Further, when Potempa learned that Plaintiff wanted to return to work, she immediately discussed with him the possibility of assignment to another Chicago-area location. Plaintiff contends there was no formal offer of such a position, but he acknowledges that the possibility was discussed and that he was not interested in moving to another location. In a footnote to its brief, Defendant argues that Plaintiff's refusal to consider another job assignment bars him from recovery of damages. (Def.'s Mem. at 9 n.9.) Plaintiff for his part has not addressed the effect of an offer of a comparable position on his claim; nor has he offered any evidence that such a transfer would have resulted in a significant loss of compensation or could otherwise be characterized as a constructive discharge. Evidence that a job transfer was genuinely available, and that such a transfer would not have constituted adverse action (let alone a constructive discharge) might well defeat any claim Plaintiff may have for damages here. More importantly, the fact that Potempa and Good were ready immediately to re-employ Plaintiff when they discovered the misunderstanding – and long before any allegation of discrimination – militates against any inference that the two were motivated by his disabilities to get rid of him.

On a motion for summary judgment, however, this court is not permitted to weigh the evidence. Because Defendant has not negated any disputes of fact concerning the timing of its offer to Debaltz, Defendant's motion for summary judgment on the disparate treatment claim is denied.

## 2.    Failure to Accommodate Claim

Plaintiff also claims that Defendant failed to accommodate his disability in violation of the

33

ADA. In addition to showing that he is a qualified individual with a disability, to survive a motion for summary judgment with regard to a failure to accommodate claim, Plaintiff must show that Defendant was aware of his disability and still failed to accommodate it. *Hoffman*, 256 F.3d at 572 (7th Cir. 2001). A plaintiff has an initial duty to inform his employer of his disability and to request reasonable accommodations before the employer's duty to engage in an "interactive process" to determine what precise accommodations are necessary arises. *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996).

In his Second Amended Complaint, Plaintiff stated that a reasonable accommodation would have been to provide "sick days and medical leave" and that such accommodation "is allowed by Defendant's policies and procedures that would not impose an undue hardship on Defendant." He alleged, further, that Defendant acknowledged that other employees, including other salespersons, who were not HIV positive and did not have depression were given medical leave, and that Defendant discriminated against Plaintiff by "refusing to reasonably accommodate Plaintiff's disabilities." (Second Am. Compl. ¶¶ 43-45.) In his brief, Plaintiff stated that "the only accommodation that Bliss request[ed] [wa]s to access his benefits without getting fired," that "[t]here is ample evidence . . . to support that Bliss was seeking information regarding FMLA leave, taking allotted sick days, and was terminated after Jennifer Convertibles became aware of the inquiry," and that his "statements to Good, Potempa, and DeBaltz [sic] regarding his request for sick days and an option of taking FMLA leave constitute notice that the FMLA benefits may be accessed by Bliss and that an accommodation may be at issue." (Pl.'s Supp. Mem., at 12-13.)

As the court understands his claim, Plaintiff contends that the accommodation to which he was entitled was the opportunity to take medical and/or sick leave at some unspecified future time, and that Defendant failed to accommodate this need for future medical leave when it fired him before he could take such leave. Defendant has not argued that it could not grant such a leave without undue burden; indeed, Defendant's consistent willingness to provide such leave for other

workers suggests it could well have done so for Plaintiff as well. Instead, Defendant contends that it did not provide accommodation because Plaintiff never requested leave and because Potempa and Good had no knowledge that Plaintiff had inquired about medical leave or was in need of any accommodation. (Def.'s Memo, at 9-10.)

Plaintiff has provided no evidence that he ever requested medical leave for a time after November 12, 1999. To be sure, Plaintiff left a voicemail message for Caplan on November 10 stating that he would not be into work for the remainder of the week and that he felt "very depressed." (Pl.'s 56.1 ¶ 15; Def.'s Resp. 56.1 ¶ 15.) In her appended introduction to this message, Good stated that Plaintiff "obviously has some mental and health issues" and suggested that Plaintiff could "go out on disability or something like that." (Id. ¶ 17) Plaintiff testified that he called Sarcona to request forms for taking medical leave, (Bliss Dep., at 57-58.); but he concedes that Good and Potempa were unaware of his request. (Def.'s 56.1 ¶ 34; Pl.'s Resp. 56.1 ¶ 34.) Because Plaintiff has provided no evidence that he actually requested any accommodation, he has not raised an issue of fact as to whether Defendant defeated his request by discharging him. In the absence of any request for accommodations, Defendant was under no duty to engage in an "interactive process" to determine what precise accommodations were necessary. See Beck, 75 F.3d at 1137. Summary judgment as to Plaintiff's failure to accommodate claim, therefore, will be granted.

## C. Breach of Contract Claim

Finally, Plaintiff contends that Defendant breached its contract with him by discharging him after he informed Defendant that he intended to request a leave of absence. (Second Am. Compl. ¶¶ 53-54.) Although not entirely clear, it appears that Plaintiff is arguing that Defendant offered him an employment contract through its Sales Associate Handbook[20] to provide medical leave for up

---

[20]     Although the Second Amended Complaint appeared to assert that Defendant had
(continued...)

to 12 weeks to employees, that Plaintiff accepted this contract, and that Defendant breached the contract. (See Pl.'s Mem., at 13.) Defendant contends that Plaintiff was an "at-will" employee and signed two disclaimers that expressly affirmed the at-will nature of Plaintiff's employment relationship with the company and stated that the Sales Associate Handbook did not constitute a contract. (Def.'s Mem., at 12.)

Plaintiff's breach of contract claim is governed by Illinois law pursuant to the *Erie* doctrine. *Cf. Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1405 (7th Cir. 1997). Under Illinois law, an employee is presumed to be "at will" if the employee is hired without a fixed term. *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 489, 505 N.E.2d 314, 317 (1987). Plaintiff correctly points out, however, that an employee handbook or other policy statement creates a contract if the traditional requirements for contract formation are present:

> First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. When these conditions are present, then the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed.

*Id.* at 490. On the other hand, as Defendant correctly points out, where the employee handbook specifically disclaims that it is a contract and the plaintiff has offered no evidence that the contract disclaimer lacks consideration or is otherwise void, such disclaimer precludes contract formation. *See, e.g., Garcia v. Kankakee County Hous. Auth.*, 279 F.3d 532, 535-36 (7th Cir. 2002) (finding statement in employee handbook that "[t]his Manual creates no rights, contractual or otherwise" and "[t]he following policies and procedures state current policy and are not themselves to be considered or interpreted as terms of an implied or express contract" were enough under Illinois

---

[20](...continued)
breached multiple unspecified "oral and written contracts," Plaintiff's brief is limited to a discussion of the Handbook, and the court so limits its discussion.

law to show that the handbook did not create legal rights) (citations omitted); *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000) ("[T]he plaintiff's contractual claim is extinguished by the statement in the handbook that 'this Policy Book is not a contract of employment . . . .' Such a disclaimer, if clear and forthright, as it is here . . . is a complete defense to a suit for breach of contract based on an employee handbook.") (internal citations omitted); *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 617 (7th Cir. 1999) ("The employee handbook specifically disclaims that it is a contract, and the handbook itself is the best evidence of whether the parties intended to form a contract. We need nothing more to conclude that it is not a contract."); *Border v. City of Crystal Lake*, 75 F.3d 270, 275 (7th Cir. 1996) (enforcing statement that "Nothing in these Personnel Policies is intended to imply that these policies serve as an employment contract" because language was clear and no employee reading it could reasonably believe employer had made an employment contract offer).

Defendant's Handbook and the two "Acknowledgment" forms Plaintiff signed contain disclaimers substantially similar to those upheld by the Court of Appeals. Page one of the Handbook states, "Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Jennifer and any of its employees." (Ex. 2 to Bliss Dep., at 1.) Plaintiff acknowledges that, on October 8, 1997, he signed and understood a separate, one-page "Acknowledgment" form that included the following disclaimer: "The Handbook and any other employment policies communicated to me by Jennifer are not intended to create an employment contract." (Pl.'s 56.1 ¶ 30; Ex. 3 to Bliss Dep.) He also admits that he signed a similar form on January 14, 1999 that contained similar language: "I acknowledge that this handbook is neither a contract of employment nor a legal document." (Pl.'s 56.1 ¶ 31; Ex. 4 to Bliss Dep.) Indeed, the fact that Plaintiff acknowledges he read and understood the language containing the disclaimers arguably precludes any claim that the language was not conspicuous. *See Tatom v. Ameritech Corp.*, 305 F.3d 737,

37

743-44 (7th Cir. 2002).

Plaintiff contends, nevertheless, that the Handbook constituted an offer of employment contract because "Illinois courts have held that benefit rights in an employee handbook should be enforceable, despite a disclaimer, as long as the rights to benefits have unequivocal language."[21] (Pl.'s Supp. Memo, at 15.) Plaintiff cites two cases to support this proposition. *See Perman v. ArcVentures, Inc.*, 196 Ill.App.3d 758, 765, 554 N.E.2d 982, 987 (1st Dist. 1990); *Mehringer v. Village of Bloomingdale*, No. 00 C 7095, 2001 WL 1105065, *5 (N.D. Ill. Sept. 19, 2001). The *Perman* court held that the employer's manual of personnel policies and procedures created an enforceable contract right despite the disclaimer after finding that the manual contained unequivocal terms and the disclaimer "was not set off from the rest of the text, printed in capital letters, or titled." 196 Ill.App.3d at 765, 554 N.E.2d at 987. The employment manual contained language that unequivocally stated that "discharges must be approved in advance by the director of employee relations or designees, and are subject to employee appeal through established grievance procedures." *Id.*

The Seventh Circuit has noted that the *Perman* holding is contrary to another Illinois Appellate Court decision. *See Workman*, 234 F.3d at 1001, citing *Davis v. Times Mirror Magazines, Inc.*, 297 Ill.App.3d 488, 697 N.E.2d 380 (1999). The *Workman* court noted that, although the Illinois Supreme Court has yet to resolve the split, a recent case "might be read to imply that a disclaimer which appears in the original handbook that the employee received, rather than being added later, is effective to bar the employee's claim of breach of contract." 234 F.3d at 1001, citing *Doyle v. Holy Cross Hosp.*, 186 Ill.2d 104, 708 N.E.2d 1140, 1145-46 (1999); *cf. Border*, 75 F.3d at 275 (expressing doubt that the *Perman* decision represents the majority view in Illinois and distinguishing *Perman* on grounds that handbook at issue in *Perman* put limits on

---

[21]     Plaintiff also notes that Defendant changes its disclaimer to one that dealt only with "at-will" employment, although he does not indicate the significance of this fact. (Pl.'s Mem., at 15.)

how discharges could be carried out); *Semerau v. Village of Schiller Park*, 210 Ill.App.3d 493, 496, 569 N.E.2d 183, 185 (1st Dist. 1991) (finding that, in contrast to *Perman*, "[i]n the case at bar, the personnel policy manual contained no mandatory procedure for grievance of an adverse employment decision such as termination of employment"); *A.B. Habighurst v. Edlong Corp.*, 209 Ill.App.3d 426, 429-30, 568 N.E.2d 226, 228-29 (1st Dist. 1991) (finding that, in contrast to *Perman*, one of the disclaimers appeared on the final page of the handbook and was signed, detached, and understood by plaintiff, and that plaintiff had failed to point to any statements which constituted clear promises such as those in *Perman*).

The *Mehringer* court held that, although an employment handbook can constitute a contract if the contractual obligation creates a tangible property right, "even if a clear promise exists, a conspicuous disclaimer of contractual obligations can negate the employer's duty." 2001 WL 1105065, at *5. The court cited *Perman, inter alia*, for the proposition that a "conspicuous disclaimer is one that is clearly distinguished from the rest of the manual's text or has been signed by the employee." *Id.* Relying on *Perman* and *Mehringer*, Plaintiff asserts that the benefit rights in an employee handbook are enforceable so long as the rights to benefits are expressed in unequivocal language. (Pl.'s Supp. Mem., at 15.)

In this court's view, however, even under the reasoning of these two opinions, the disclaimers in this case must be upheld. First, the disclaimers that Plaintiff signed provided clear and conspicuous notice that the Handbook did not constitute an employment contract. Both disclaimers were clearly stated within the "Acknowledgment" forms, were contained in a one-page document separate from the text of the manual, and required an employee signature immediately below the text of the disclaimer. (Exs. 3 & 4 of Bliss Dep.) No reasonable employee reading and signing the Acknowledgment form could believe that Defendant had made an employment contract offer. *See Border*, 75 F.3d at 275. Second, in contrast to *Perman*, where the handbook guaranteed certain procedural safeguards before an employee could be discharged, here the

39

provisions of the Sales Associate Handbook suggest that Defendant retained discretion whether to grant employee requests for medical leave. The provision title "Medical Leave," for example, states, in relevant part:

> Eligible employees should make requests for medical leave to their supervisors at least thirty days in advance of foreseeable events and as soon as possible for unforeseeable events . . . . Eligible employees are normally granted leave for the period of the disability, up to a maximum of twelve weeks within any twelve-month period. Any combination of medical leave and family leave may not exceed this maximum limit.

Ex. 3 of Good Dep, at 24-25.)[22]

Because Defendant's employment handbook did not create a contract between the parties, Defendant's motion for summary judgment as to Plaintiff's breach of contract claim will be granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion (Doc. 21-1) is hereby granted as to Counts I and III, denied as to the disparate treatment claim of Count II, and granted as to the reasonable accommodation claim of Count II.

ENTER:

Dated: September 29, 2003

REBECCA R. PALLMEYER
United States District Judge

---

[22] In any event, the court sees no disputes of fact concerning Defendant's compliance with the handbook provisions at issue here. The only real dispute is whether Defendant replaced Plaintiff precipitously due to his disability. There is no basis for a conclusion that Defendant denied any formal or informal request for a medical leave.